E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
IAN V. YANNIELLO (Cal. Bar No. 265481)
Assistant United States Attorney
Chief, General Crimes Section
HAOXIAOHAN CAI (Cal. Bar No. 331131)
Assistant United States Attorney
Major Frauds Section
1200/1100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone:    (213) 894-3667/0762
Facsimile:    (213) 894-0141
E-mail:    Ian.Yanniello@usdoj.gov
          Haoxiaohan.Cai@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

```
FILED
CLERK, U.S. DISTRICT COURT

7/12/24

CENTRAL DISTRICT OF CALIFORNIA
BY:      MR      DEPUTY
```

```
LODGED
CLERK, U.S. DISTRICT COURT

7/12/2024

CENTRAL DISTRICT OF CALIFORNIA
BY:      CDO      DEPUTY
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR   2:24-cr-00417-AB |
|---|---|
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT ERIK FLEMING |
| v. | |
| ERIK FLEMING, | |
| Defendant. | |

1.    This constitutes the plea agreement between ERIK FLEMING ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") related to the investigation of the drug overdose death of Victim M.P.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

DEFENDANT'S OBLIGATIONS

2.    Defendant agrees to:

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to an information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with conspiracy to distribute ketamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(E)(i) (Count One) and distribution of ketamine resulting in death and serious bodily injury, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(E)(i) (Count Two).

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessments at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

h.   Defendant understands that the government obtained additional material in this investigation that defendant has not been shown.  In exchange for the government's obligations under this agreement, defendant gives up any right he may have had to review the

2

1  additional material, regardless of whether it is arguably exculpatory

2  or inculpatory, and further agrees to waive any argument that the

3  withholding of this material caused defendant's plea to be not

4  knowing or involuntary.  The government agrees not to use at

5  sentencing any of the withheld material without providing it to

6  defendant.

7       3.   Defendant further agrees to cooperate fully with the USAO,

8  the Drug Enforcement Administration, the United States Postal

9  Inspection Service, the Los Angeles Police Department, and, as

10 directed by the USAO, any other federal, state, local, or foreign

11 prosecuting, enforcement, administrative, or regulatory authority.

12 This cooperation requires defendant to:

13       a.   Respond truthfully and completely to all questions

14 that may be put to defendant, whether in interviews, before a grand

15 jury, or at any trial or other court proceeding.

16       b.   Attend all meetings, grand jury sessions, trials or

17 other proceedings at which defendant's presence is requested by the

18 USAO or compelled by subpoena or court order.

19       c.   Produce voluntarily all documents, records, or other

20 tangible evidence relating to matters about which the USAO, or its

21 designee, inquires.

22       4.   For purposes of this agreement: (1) "Cooperation

23 Information" shall mean any statements made, or documents, records,

24 tangible evidence, or other information provided, by defendant

25 pursuant to defendant's cooperation under this agreement or pursuant

26 to the letter agreement previously entered into by the parties dated

27 March 28, 2024 (the "Letter Agreement"); and (2) "Plea Information"

28 shall mean any statements made by defendant, under oath, at the

3

1  guilty plea hearing and the agreed to factual basis statement in this
2  agreement.

3                          THE USAO'S OBLIGATIONS

4       5.   The USAO agrees to:

5            a.   Not contest facts agreed to in this agreement.

6            b.   Abide by all agreements regarding sentencing contained
7  in this agreement.

8            c.   At the time of sentencing, provided that defendant
9  demonstrates an acceptance of responsibility for the offenses up to
10 and including the time of sentencing, recommend a two-level reduction
11 in the applicable Sentencing Guidelines offense level, pursuant to
12 U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an
13 additional one-level reduction if available under that section.

14      6.   The USAO further agrees:

15           a.   Not to offer as evidence in its case-in-chief in the
16 above-captioned case or any other criminal prosecution that may be
17 brought against defendant by the USAO, or in connection with any
18 sentencing proceeding in any criminal case that may be brought
19 against defendant by the USAO, any Cooperation Information.
20 Defendant agrees, however, that the USAO may use both Cooperation
21 Information and Plea Information: (1) to obtain and pursue leads to
22 other evidence, which evidence may be used for any purpose, including
23 any criminal prosecution of defendant; (2) to cross-examine defendant
24 should defendant testify, or to rebut any evidence offered, or
25 argument or representation made, by defendant, defendant's counsel,
26 or a witness called by defendant in any trial, sentencing hearing, or
27 other court proceeding; and (3) in any criminal prosecution of
28 defendant for false statement, obstruction of justice, or perjury.

1    b.    Not to use Cooperation Information against defendant
2 at sentencing for the purpose of determining the applicable guideline
3 range, including the appropriateness of an upward departure, or the
4 sentence to be imposed, and to recommend to the Court that
5 Cooperation Information not be used in determining the applicable
6 guideline range or the sentence to be imposed.  Defendant
7 understands, however, that Cooperation Information will be disclosed
8 to the United States Probation and Pretrial Services Office and the
9 Court, and that the Court may use Cooperation Information for the
10 purposes set forth in U.S.S.G § 1B1.8(b) and for determining the
11 sentence to be imposed.
12    c.    In connection with defendant's sentencing, to bring to
13 the Court's attention the nature and extent of defendant's
14 cooperation.
15    d.    If the USAO determines, in its exclusive judgment,
16 that defendant has both complied with defendant's obligations under
17 paragraphs 2 and 3 above and provided substantial assistance to law
18 enforcement in the prosecution or investigation of another
19 ("substantial assistance"), to move the Court pursuant to U.S.S.G.
20 § 5K1.1 to fix an offense level and corresponding guideline range
21 below that otherwise dictated by the sentencing guidelines, and to
22 recommend a term of imprisonment within this reduced range.
23    DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION
24    7.    Defendant understands the following:
25    a.    Any knowingly false or misleading statement by
26 defendant will subject defendant to prosecution for false statement,
27 obstruction of justice, and perjury and will constitute a breach by
28 defendant of this agreement.

b.    Nothing in this agreement requires the USAO or any other prosecuting, enforcement, administrative, or regulatory authority to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c.    Defendant cannot withdraw defendant's guilty plea if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced guideline range or if the USAO makes such a motion and the Court does not grant it or if the Court grants such a USAO motion but elects to sentence above the reduced range.

d.    At this time the USAO makes no agreement or representation as to whether any cooperation that defendant has provided or intends to provide constitutes or will constitute substantial assistance.  The decision whether defendant has provided substantial assistance will rest solely within the exclusive judgment of the USAO.

e.    The USAO's determination whether defendant has provided substantial assistance will not depend in any way on whether the government prevails at any trial or court hearing in which defendant testifies or in which the government otherwise presents information resulting from defendant's cooperation.

<u>NATURE OF THE OFFENSES</u>

8.    Defendant understands that for defendant to be guilty of the crime charged in Count One of the Information, that is, conspiracy to distribute ketamine, in violation of Title 21, United States Code, Sections 846, and 841(a)(1), (b)(1)(E)(i), the following must be true: (1) there was an agreement between two or more persons to distribute ketamine, a Schedule III controlled substance; and (2)

1 | defendant joined in that agreement knowing of its purpose and
2 | intending to help accomplish that purpose.

3 |     9.   Defendant understands that for defendant to be guilty of
4 | the crime charged in Count Two of the Information, that is,
5 | distribution of ketamine resulting in death and serious bodily
6 | injury, in violation of Title 21, United States Code, Sections
7 | 841(a)(1), (b)(1)(E)(i), the following must be true: (1) defendant
8 | knowingly distributed ketamine; (2) defendant knew that it was
9 | ketamine or some other federally controlled substance; (3) death or
10 | serious bodily injury resulted from the use of such controlled
11 | substance.

12 |     10.  Defendant understands that for defendant to be subject to
13 | the statutory maximum sentence set forth below, applicable to Count
14 | Two, the government must prove beyond a reasonable doubt that the use
15 | of ketamine distributed by defendant caused serious bodily injury or
16 | death of another, namely, Victim M.P., as alleged in the Information,
17 | pursuant to Title 21, United States Code, Section 841(b)(1)(E)(i).
18 | Defendant admits that defendant, in fact, distributed ketamine used
19 | by Victim M.P. and that such ketamine caused Victim M.P.'s death.

20 |                              <u>PENALTIES</u>

21 |     11.  Defendant understands that the statutory maximum sentence
22 | that the Court can impose for Count One, that is, conspiracy to
23 | distribute ketamine, in violation of Title 21, United States Code,
24 | Sections 846, 841(a)(1), (b)(1)(E)(i), is: 10 years imprisonment; a
25 | 3-year period of supervised release; a fine of $500,000 or twice the
26 | gross gain or gross loss resulting from the offense, whichever is
27 | greatest; and a mandatory special assessment of $100.

28 |

1       12.  Defendant understands that the statutory maximum sentence

2  that the Court can impose for Count Two, that is, distribution of

3  ketamine resulting in death and serious bodily injury, in violation

4  of Title 21, United States Code, Sections 841(a)(1), (b)(1)(E)(i),

5  is: 15 years imprisonment; a 3-year period of supervised release; a

6  fine of $500,000 or twice the gross gain or gross loss resulting from

7  the offense, whichever is greatest; and a mandatory special

8  assessment of $100.

9       13.  Defendant understands, therefore, that the total maximum

10  sentence for all offenses to which defendant is pleading guilty is:

11  25 years imprisonment; a 3-year period of supervised release; a fine

12  of $1,000,000 or twice the gross gain or gross loss resulting from

13  the offenses, whichever is greatest; and a mandatory special

14  assessment of $200.

15       14.  Defendant understands that under 21 U.S.C. § 862a,

16  defendant will not be eligible for assistance under state programs

17  funded under the Social Security Act or Federal Food Stamp Act or for

18  federal food stamp program benefits, and that any such benefits or

19  assistance received by defendant's family members will be reduced to

20  reflect defendant's ineligibility.

21       15.  Defendant understands that supervised release is a period

22  of time following imprisonment during which defendant will be subject

23  to various restrictions and requirements.  Defendant understands that

24  if defendant violates one or more of the conditions of any supervised

25  release imposed, defendant may be returned to prison for all or part

26  of the term of supervised release authorized by statute for the

27  offense that resulted in the term of supervised release, which could

28

1  result in defendant serving a total term of imprisonment greater than

2  the statutory maximum stated above.

3      16.   Defendant understands that, by pleading guilty, defendant

4  may be giving up valuable government benefits and valuable civic

5  rights, such as the right to vote, the right to possess a firearm,

6  the right to hold office, and the right to serve on a jury.

7  Defendant understands that he is pleading guilty to a felony and that

8  it is a federal crime for a convicted felon to possess a firearm or

9  ammunition.   Defendant understands that the conviction in this case

10  may also subject defendant to various other collateral consequences,

11  including but not limited to revocation of probation, parole, or

12  supervised release in another case and suspension or revocation of a

13  professional license.   Defendant understands that unanticipated

14  collateral consequences will not serve as grounds to withdraw

15  defendant's guilty plea.

16      17.   Defendant and his counsel have discussed the fact that, and

17  defendant understands that, if defendant is not a United States

18  citizen, the conviction in this case makes it practically inevitable

19  and a virtual certainty that defendant will be removed or deported

20  from the United States.   Defendant may also be denied United States

21  citizenship and admission to the United States in the future.

22  Defendant understands that while there may be arguments that

23  defendant can raise in immigration proceedings to avoid or delay

24  removal, removal is presumptively mandatory and a virtual certainty

25  in this case.   Defendant further understands that removal and

26  immigration consequences are the subject of a separate proceeding and

27  that no one, including his attorney or the Court, can predict to an

28  absolute certainty the effect of his conviction on his immigration

1   status.  Defendant nevertheless affirms that he wants to plead guilty

2   regardless of any immigration consequences that his plea may entail,

3   even if the consequence is automatic removal from the United States.

4                              FACTUAL BASIS

5       18.  Defendant admits that defendant is, in fact, guilty of the

6   offenses to which defendant is agreeing to plead guilty.  Defendant

7   and the USAO agree to the statement of facts provided below and agree

8   that this statement of facts is sufficient to support a plea of

9   guilty to the charges described in this agreement and to establish

10  the Sentencing Guidelines factors set forth in paragraph 20 below but

11  is not meant to be a complete recitation of all facts relevant to the

12  underlying criminal conduct or all facts known to either party that

13  relate to that conduct.

14      Beginning on an unknown date but no later than in or around

15  October 2023, and continuing until at least October 30, 2023, in Los

16  Angeles County, within the Central District of California, and

17  elsewhere, defendant conspired with others known and unknown,

18  including Co-Conspirators Kenneth IWAMASA ("Co-Conspirator IWAMASA")

19  and Jasveen SANGHA ("Co-Conspirator SANGHA"), to knowingly and

20  intentionally distribute ketamine, a schedule III federally

21  controlled substance. Defendant joined the agreement knowing of its

22  purpose and intending to help accomplish its purpose.

23  **Defendant Conspires with IWAMASA and SANGHA to Obtain and Distribute**

24                    **Ketamine to Victim M.P.**

25      Prior to October 4, 2023, defendant FLEMING was acquainted with

26  Victim M.P. through a mutual friend ("Individual 1").  Individual 1

27  told defendant FLEMING that Victim M.P. was interested in acquiring

28  ketamine, and that Victim M.P. was already getting ketamine

injections from medical doctors.  Beginning on or about October 4,
2023, defendant FLEMING contacted Victim M.P. to offer to sell
ketamine to Victim M.P.

About a week later, on October 10, 2023, defendant FLEMING
texted Victim M.P. that he had "a bunch of the K in liquid," which he
would sell at a "good price," and that he just needed a "fair tip for
bringing it."  That same day, defendant FLEMING began to communicate
with Co-Conspirator IWAMASA, who defendant FLEMING understood was
Victim M.P.'s personal assistant.  Co-Conspirator IWAMASA texted
defendant FLEMING to ask: "How much do you want per bottle and what
is the nice tip you want"?  Defendant FLEMING confirmed he was
willing to obtain and deliver the ketamine, stating: "perfect- and
ill bring to you" and "Getting price now. I need some upfront to pay
when I pick up. And rest when I deliver."  Defendant FLEMING also
sent Co-Conspirator IWAMASA a text depicting an image of a vial of
ketamine with a horse photograph on the packaging and stated: "10 ml
vial - pure - $300 vial.  Is 1000 fai[r] for me?  - let me know how
many vials."

At around this time, defendant FLEMING separately texted
Individual 2, who Defendant FLEMING knew could connect him with a
source of ketamine. Individual 2 told defendant FLEMING that her
source, Co-Conspirator SANGHA, who defendant FLEMING knew as the
"Ketamine Queen," had ketamine available for sale, noting "But u have
to go pick it up."  Individual 2 gave defendant FLEMING a phone
number to contact Co-Conspirator SANGHA.  Defendant FLEMING then
communicated with Co-Conspirator SANGHA directly using Signal, an
encrypted communication application, and said: "Hi Jas. It's Erik.
[Individual 2's] friend.  Let me know your addy," and "How many vials

1  do u have availability"? Using the Signal application, Co-Conspirator
2  SANGHA and defendant FLEMING discussed the type and price of the
3  ketamine that Co-Conspirator SANGHA had available for sale.
4      On or about October 11, 2023, defendant FLEMING received
5  messages from Co-Conspirator SANGHA over Signal which he forwarded to
6  Co-Conspirator IWAMASA by capturing those messages in a screenshot.
7  Among other things, Co-Conspirator SANGHA stated that her ketamine
8  was high quality and offered to provide a sample for Victim M.P.,
9  stating: "It's unmarked but it's amazing - he take one and try it and
10  I have more if he likes." Defendant FLEMING told Co-Conspirator
11  IWAMASA that the message was from his ketamine dealer, noting:
12  "[j]ust got this from my person. She only deal[s] with high end and
13  celebs. If it were not great stuff she'd lose her business." When
14  Co-Conspirator IWAMASA inquired about the source of the "unmarked"
15  ketamine, defendant FLEMING assured Co-Conspirator IWAMASA that
16  "[i]t's sealed in vials. It might be worth a try. I did some calling
17  around about the Mexican stuff and it's fine for people too."
18      On or about October 12, 2023, defendant FLEMING contacted Co-
19  Conspirator SANGHA to obtain a sample vial of ketamine for Victim
20  M.P. During that conversation, or before, defendant FLEMING told Co-
21  Conspirator SANGHA that Victim M.P. was the customer to whom
22  defendant FLEMING and Co-Conspirator SANGHA would be selling the
23  ketamine.  When Co-Conspirator SANGHA communicated with defendant
24  FLEMING about Victim M.P., Co-Conspirator SANGHA referred to Victim
25  M.P. using a name of a well-known character that Victim M.P.
26  portrayed in a television series.  Defendant FLEMING subsequently
27  told Co-Conspirator IWAMASA the following: "The hook up was able to
28  get the kind that is used for intermuscular.  It's exactly what

1  [Victim M.P.] wants . . . She will give me the first one for 180.  So
2  you would need to Zell me 180.  . . . I guarantee it's going to be
3  amazing."  Defendant FLEMING also confirmed he would not be selling
4  the drugs if he could not make money doing so, stating: "I wouldn't
5  do it if there wasn't a chance of me making some money for doing
6  this."

7       On or about October 13, 2023, defendant FLEMING drove to Co-
8  Conspirator SANGHA's residence, in North Hollywood, California, to
9  obtain the sample ketamine vial for Victim M.P., which was an
10 unlabeled, unmarked clear glass vial with a blue cap.  Other than Co-
11 Conspirator SANGHA's representation that the clear liquid was
12 ketamine, defendant FLEMING had no knowledge about the contents of
13 the vial, including the concentration or strength of the ketamine
14 inside.

15      Later that same day, defendant FLEMING drove to Victim M.P.'s
16 residence, in Los Angeles County, and delivered the vial of ketamine
17 to Co-Conspirator IWAMASA in exchange for $180.  When defendant
18 FLEMING delivered the ketamine, or before, Co-Conspirator IWAMASA
19 told defendant FLEMING that he was administering ketamine to Victim
20 M.P. through intermuscular injections.  Based on conversations with
21 Co-Conspirator IWAMASA, defendant FLEMING knew that Co-Conspirator
22 IWAMASA was employed as a personal assistant and had no medical
23 experience or training.  Co-Conspirator IWAMASA injected Victim M.P.
24 with defendant FLEMING's ketamine a short time later and then sent
25 defendant FLEMING a text message describing Victim M.P.'s response,
26 stating "seems good ... What number of bots does she have?" referring
27 to defendant FLEMING's ketamine supplier, Co-Conspirator SANGHA.
28 Defendant FLEMING responded, "As many as u want" and "Let me know how

13

many he wants and I'll confirm what she can get. But as of now she said she can fill any order." Prior to this text message conversation, defendant FLEMING had been quoted a price of $160 per vial of ketamine by Co-Conspirator SANGHA, but defendant FLEMING marked up the price and told Co-Conspirator IWAMASA that the price was higher, i.e., $220 per vial. Co-Conspirator IWAMASA told defendant FLEMING he would purchase "25 vials $5500 @220 +500 for you for logistics." Defendant FLEMING asked Co-Conspirator IWAMASA to advance him his $500 cut, and Co-Conspirator IWAMASA complied by sending an electronic payment to defendant FLEMING.

On October 14, 2023, defendant FLEMING met Co-Conspirator IWAMASA outside of Victim M.P.'s residence, where defendant FLEMING picked up $5,500 in cash to pay Co-Conspirator SANGHA. That same day, defendant FLEMING traveled to Co-Conspirator SANGHA's residence in North Hollywood, California, where he delivered cash in exchange for 25 vials of ketamine. At the time, defendant FLEMING and Co-Conspirator SANGHA discussed Victim M.P. and the possibility of future ketamine sales. Defendant FLEMING thereafter traveled back to Victim M.P.'s residence, where he delivered 25 vials of ketamine to Co-Conspirator IWAMASA.

On October 23, 2023, Co-Conspirator IWAMASA contacted defendant FLEMING to purchase more ketamine, stating: "Can we do same as last time again over next 2 days?" Defendant FLEMING confirmed he could obtain "another 25 bottles," and that "[i]t will be same product. You want same amount? Put the 5500 together asap and ill come get it as soon as possible to get it all done tonight." After Co-Conspirator IWAMASA agreed, defendant FLEMING traveled to Victim M.P.'s residence at approximately 8 p.m. on October 23 and picked up approximately

1  $6,000 in cash from Co-Conspirator IWAMASA, which included cash

2  intended for buying ketamine from Co-Conspirator SANGHA.

3      Between October 23 and October 24, 2023, defendant FLEMING told

4  Co-Conspirator SANGHA that they had another order from Victim M.P.

5  and the two communicated multiple times to coordinate the sale of 25

6  vials of ketamine to Victim M.P.  Based on information from Co-

7  Conspirator SANGHA, defendant provided updates to Co-Conspirator

8  IWAMASA about the timing and delivery of the ketamine.  For example,

9  defendant FLEMING texted Co-Conspirator IWAMASA that Co-Conspirator

10  SANGHA's source of supply, who Co-Conspirator SANGHA referred to as

11  "master chef" and the "scientist," was working on making the large

12  order of ketamine available.  At approximately 10:47 a.m., on October

13  24, defendant FLEMING told Co-Conspirator IWAMASA, "[i]t's on its way

14  to our girl," referring to Co-Conspirator SANGHA, and "I should have

15  an ETA anytime soon."  Defendant FLEMING subsequently picked up 25

16  vials of ketamine from Co-Conspirator SANGHA at her residence, and

17  delivered the ketamine to Co-Conspirator IWAMASA at Victim M.P.'s

18  residence at approximately 10:52 p.m. on October 24.  Included in

19  defendant's delivery of ketamine vials from Co-Conspirator SANGHA

20  were ketamine lollipops that Co-Conspirator SANGHA included as an

21  "add on" for the large ketamine order.

22      On October 26, 2023, defendant FLEMING reached out to Co-

23  Conspirator IWAMASA to suggest a better way of packaging a future

24  delivery of ketamine, stating: "How are you? I realized on next

25  shipment we could probably get it packaged in fewer bigger boxes

26  instead or resale size."

27  //

28  //

1       **Victim M.P. Dies from the Acute Effects of Ketamine**

2       In the days leading up to October 28, 2023, defendant FLEMING

3 knew that Co-Conspirator IWAMASA was using the ketamine sold by

4 defendant FLEMING and Co-Conspirator SANGHA to inject Victim M.P.

5 with intramuscular injections. As noted above, defendant FLEMING

6 knew that Co-Conspirator IWAMASA was not a medical doctor and did not

7 have training to administer controlled substances.

8       On October 28, 2023, Co-Conspirator IWAMASA injected Victim M.P.

9 with at least three shots of ketamine obtained from defendant FLEMING

10 and Co-Conspirator SANGHA. Victim M.P. was found later that day face

11 down in a jacuzzi and deceased. The Los Angeles County Medical

12 Examiner Medical conducted an autopsy and determined that Victim M.P.

13 had a significant amount of ketamine in his blood and that his death

14 resulted from the "acute effects of ketamine." Defendant FLEMING

15 admits that Victim M.P.'s death was due to effects of ketamine that

16 he and Co-Conspirator SANGHA sold to Co-Conspirator IWAMASA, and that

17 but for the presence of that ketamine in Victim M.P.'s bloodstream,

18 Victim M.P. would not have died on October 28, 2023.

19 **After Learning of Victim M.P.'s Death, Defendant FLEMING Communicates**

20   **with Co-Conspirators About Concealing the Drug Deals and Destroying**

21                     **Evidence**

22       After discovering that Victim M.P. had died, defendant FLEMING

23 coordinated with other members of the conspiracy about concealing

24 their involvement in Victim M.P.'s death. On the day of Victim

25 M.P.'s death, Co-Conspirator SANGHA called defendant FLEMING on the

26 Signal application and informed defendant FLEMING about Victim M.P.'s

27 death. During the call, the co-conspirators discussed the need to

28 distance themselves from the drug deal by, among other things,

deleting digital evidence on their cell phones.  Defendant FLEMING
also told Co-Conspirator SANGHA that he would reach out to Co-
Conspirator IWAMASA to gather more information about Victim M.P.'s
death.  After the call concluded, Co-Conspirator SANGHA sent a text
message to defendant FLEMING reiterating that he should delete all of
their prior text messages.  Around the same time, Co-Conspirator
SANGHA updated the setting on the Signal application to automatically
delete messages with defendant FLEMING.

On or about October 30, 2023 --- two days after Victim M.P.'s
death --- defendant FLEMING spoke with Co-Conspirator IWAMASA on the
phone about Victim M.P.'s death.  During the call, Co-Conspirator
IWAMASA told defendant FLEMING that he had cleaned up the scene,
including the ketamine bottles and syringes, and that he had "deleted
everything."  After speaking with Co-Conspirator IWAMASA, defendant
FLEMING reached out to Co-Conspirator SANGHA using the Signal
application to discuss the information he received from Co-
Conspirator IWAMASA.  Among other things, defendant FLEMING told Co-
Conspirator SANGHA: "Please call... Got more info and want to bounce
ideas off you.  I'm 90% sure everyone is protected. I never dealt
with [Victim M.P.]. Only his Assistant. So the Assistant was the
enabler. Also they are doing a 3 month tox screening ... Does K stay
in your system or is it immediately flushed out[?]"

SENTENCING FACTORS

19.  Defendant understands that in determining defendant's
sentence the Court is required to calculate the applicable Sentencing
Guidelines range and to consider that range, possible departures
under the Sentencing Guidelines, and the other sentencing factors set
forth in 18 U.S.C. § 3553(a).  Defendant understands that the

17

1  Sentencing Guidelines are advisory only, that defendant cannot have

2  any expectation of receiving a sentence within the calculated

3  Sentencing Guidelines range, and that after considering the

4  Sentencing Guidelines and the other § 3553(a) factors, the Court will

5  be free to exercise its discretion to impose any sentence it finds

6  appropriate up to the maximum set by statute for the crimes of

7  conviction.

8      20.  Defendant and the USAO agree to the following applicable

9  Sentencing Guidelines factors:

10    Base Offense Level:              26    [U.S.S.G. § 2D1.1(A)(4)]

11

12  Defendant and the USAO reserve the right to argue that additional

13  specific offense characteristics, adjustments, and departures under

14  the Sentencing Guidelines are appropriate, including a two-level

15  enhancement for obstruction of justice under U.S.S.G. § 3C1.1.

16  Defendant understands that there is no agreement as to defendant's

17  criminal history or criminal history category.

18      21.  Defendant and the USAO reserve the right to argue for a

19  sentence outside the sentencing range established by the Sentencing

20  Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),

21  (a)(2), (a)(3), (a)(6), and (a)(7).

22                    WAIVER OF CONSTITUTIONAL RIGHTS

23      22.  Defendant understands that by pleading guilty, defendant

24  gives up the following rights:

25          a.   The right to persist in a plea of not guilty.

26          b.   The right to a speedy and public trial by jury.

27          c.   The right to be represented by counsel - and if

28  necessary have the Court appoint counsel - at trial.  Defendant

1 | understands, however, that, defendant retains the right to be
2 | represented by counsel – and if necessary have the Court appoint
3 | counsel – at every other stage of the proceeding.

4 |       d.   The right to be presumed innocent and to have the
5 | burden of proof placed on the government to prove defendant guilty
6 | beyond a reasonable doubt.

7 |       e.   The right to confront and cross-examine witnesses
8 | against defendant.

9 |       f.   The right to testify and to present evidence in
10 | opposition to the charges, including the right to compel the
11 | attendance of witnesses to testify.

12 |       g.   The right not to be compelled to testify, and, if
13 | defendant chose not to testify or present evidence, to have that
14 | choice not be used against defendant.

15 |       h.   Any and all rights to pursue any affirmative defenses,
16 | Fourth Amendment or Fifth Amendment claims, and other pretrial
17 | motions that have been filed or could be filed.

18 | <u>WAIVER OF APPEAL OF CONVICTION</u>

19 |    23.  Defendant understands that, with the exception of an appeal
20 | based on a claim that defendant's guilty pleas were involuntary, by
21 | pleading guilty defendant is waiving and giving up any right to
22 | appeal defendant's conviction on the offenses to which defendant is
23 | pleading guilty.  Defendant understands that this waiver includes,
24 | but is not limited to, arguments that the statutes to which defendant
25 | is pleading guilty are unconstitutional, and any and all claims that
26 | the statement of facts provided herein is insufficient to support
27 | defendant's plea of guilty.

28

LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE AND COLLATERAL ATTACK

24. Defendant agrees that, provided the Court imposes a total term of imprisonment within or below the range corresponding to an offense level of 25 and the criminal history category calculated by the Court, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (f) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in Second Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

25. Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction. Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of

1  facts provided herein is insufficient to support defendant's plea of

2  guilty.

3      26.   The USAO agrees that, provided (a) all portions of the

4  sentence are at or below the statutory maximum specified above and

5  (b) the Court imposes a term of imprisonment within or above the

6  range corresponding to an offense level of 25 and the criminal

7  history calculated by the Court, the USAO gives up its right to

8  appeal any portion of the sentence.

9              RESULT OF WITHDRAWAL OF GUILTY PLEA

10     27.   Defendant agrees that if, after entering a guilty plea

11 pursuant to this agreement, defendant seeks to withdraw and succeeds

12 in withdrawing defendant's guilty plea on any basis other than a

13 claim and finding that entry into this plea agreement was

14 involuntary, then (a) the USAO will be relieved of all of its

15 obligations under this agreement, including in particular its

16 obligations regarding the use of Cooperation Information; (b) in any

17 investigation, criminal prosecution, or civil, administrative, or

18 regulatory action, defendant agrees that any Cooperation Information

19 and any evidence derived from any Cooperation Information shall be

20 admissible against defendant, and defendant will not assert, and

21 hereby waives and gives up, any claim under the United States

22 Constitution, any statute, or any federal rule, that any Cooperation

23 Information or any evidence derived from any Cooperation Information

24 should be suppressed or is inadmissible; and (c) should the USAO

25 choose to pursue any charge that was either dismissed or not filed as

26 a result of this agreement, then (i) any applicable statute of

27 limitations will be tolled between the date of defendant's signing of

28 this agreement and the filing commencing any such action; and

                              21

(ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

EFFECTIVE DATE OF AGREEMENT

28.   This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

BREACH OF AGREEMENT

29.   Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  For example, if defendant knowingly, in an interview, before a grand jury, or at trial, falsely accuses another person of criminal conduct or falsely minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

        a.   If defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea.

22

 1         b.    The USAO will be relieved of all its obligations under
 2  this agreement; in particular, the USAO: (i) will no longer be bound
 3  by any agreements concerning sentencing and will be free to seek any
 4  sentence up to the statutory maximum for the crimes to which
 5  defendant has pleaded guilty; (ii) will no longer be bound by any
 6  agreements regarding criminal prosecution, and will be free to
 7  criminally prosecute defendant for any crime; and (iii) will no
 8  longer be bound by any agreement regarding the use of Cooperation
 9  Information and will be free to use any Cooperation Information in
10  any way in any investigation, criminal prosecution, or civil,
11  administrative, or regulatory action.
12         c.    The USAO will be free to criminally prosecute
13  defendant for false statement, obstruction of justice, and perjury
14  based on any knowingly false or misleading statement by defendant.
15         d.    In any investigation, criminal prosecution, or civil,
16  administrative, or regulatory action: (i) defendant will not assert,
17  and hereby waives and gives up, any claim that any Cooperation
18  Information was obtained in violation of the Fifth Amendment
19  privilege against compelled self-incrimination; and (ii) defendant
20  agrees that any Cooperation Information and any Plea Information, as
21  well as any evidence derived from any Cooperation Information or any
22  Plea Information, shall be admissible against defendant, and
23  defendant will not assert, and hereby waives and gives up, any claim
24  under the United States Constitution, any statute, Rule 410 of the
25  Federal Rules of Evidence, Rule 11(f) of the Federal Rules of
26  Criminal Procedure, or any other federal rule, that any Cooperation
27  Information, any Plea Information, or any evidence derived from any

28

1  Cooperation Information or any Plea Information should be suppressed
2  or is inadmissible.

### COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES
### OFFICE NOT PARTIES

5      30.   Defendant understands that the Court and the United States
6  Probation and Pretrial Services Office are not parties to this
7  agreement and need not accept any of the USAO's sentencing
8  recommendations or the parties' agreements to facts or sentencing
9  factors.

10     31.   Defendant understands that both defendant and the USAO are
11 free to: (a) supplement the facts by supplying relevant information
12 to the United States Probation and Pretrial Services Office and the
13 Court, (b) correct any and all factual misstatements relating to the
14 Court's Sentencing Guidelines calculations and determination of
15 sentence, and (c) argue on appeal and collateral review that the
16 Court's Sentencing Guidelines calculations and the sentence it
17 chooses to impose are not error, although each party agrees to
18 maintain its view that the calculations in paragraph 20 are
19 consistent with the facts of this case.  While this paragraph permits
20 both the USAO and defendant to submit full and complete factual
21 information to the United States Probation and Pretrial Services
22 Office and the Court, even if that factual information may be viewed
23 as inconsistent with the facts agreed to in this agreement, this
24 paragraph does not affect defendant's and the USAO's obligations not
25 to contest the facts agreed to in this agreement.

26     32.   Defendant understands that even if the Court ignores any
27 sentencing recommendation, finds facts or reaches conclusions
28 different from those agreed to, and/or imposes any sentence up to the

1  maximum established by statute, defendant cannot, for that reason,

2  withdraw defendant's guilty plea, and defendant will remain bound to

3  fulfill all defendant's obligations under this agreement.  Defendant

4  understands that no one -- not the prosecutor, defendant's attorney,

5  or the Court -- can make a binding prediction or promise regarding

6  the sentence defendant will receive, except that it will be within

7  the statutory maximum.

NO ADDITIONAL AGREEMENTS

9     33.  Defendant understands that, except as set forth herein,

10  there are no promises, understandings, or agreements between the USAO

11  and defendant or defendant's attorney, and that no additional

12  promise, understanding, or agreement may be entered into unless in a

13  writing signed by all parties or on the record in court.

14  //

15  //

16  //

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

34.   The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

E. MARTIN ESTRADA
United States Attorney

_____                          7/3/24
IAN V. YANNIELLO                                   Date
HAOXIAOHAN CAI
Assistant United States Attorneys

_____                          7/3/24
ERIK FLEMING                                       Date
Defendant

_____                          7/3/24
BURTON JACOBSON                                    Date
Attorney for Defendant ERIK
FLEMING


CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety.  I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences

1   of entering into this agreement.  No promises, inducements, or

2   representations of any kind have been made to me other than those

3   contained in this agreement.  No one has threatened or forced me in

4   any way to enter into this agreement.  I am satisfied with the

5   representation of my attorney in this matter, and I am pleading

6   guilty because I am guilty of the charges and wish to take advantage

7   of the promises set forth in this agreement, and not for any other

8   reason.

9   _____            7/3/24

10  ERIK FLEMING                           Date
    Defendant

11

12

13

14

15

16

17

18

19              CERTIFICATION OF DEFENDANT'S ATTORNEY

20       I am ERIK FLEMING's attorney.  I have carefully and thoroughly

21  discussed every part of this agreement with my client.  Further, I

22  have fully advised my client of his rights, of possible pretrial

23  motions that might be filed, of possible defenses that might be

24  asserted either prior to or at trial, of the sentencing factors set

25  forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

26  provisions, and of the consequences of entering into this agreement.

27  To my knowledge: no promises, inducements, or representations of any

28  kind have been made to my client other than those contained in this

                                27

1  agreement; no one has threatened or forced my client in any way to

2  enter into this agreement; my client's decision to enter into this

3  agreement is an informed and voluntary one; and the factual basis set

4  forth in this agreement is sufficient to support my client's entry of

5  a guilty plea pursuant to this agreement.

6

7  _____          7 /9/24
   BURTON JACOBSON                                Date
8  Attorney for Defendant ERIK
   FLEMING

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28

# Exhibit A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. |
|---|---|
| Plaintiff, | I N F O R M A T I O N |
| v. | [21 U.S.C. § 846: Conspiracy to Distribute Ketamine; 21 U.S.C. §§ 841(a)(1), (b)(1)(E)(i): Distribution of Ketamine Resulting in Death and Serious Bodily Injury] |
| ERIK FLEMING, | |
| Defendant. | |

The United States Attorney charges:

COUNT ONE

[21 U.S.C. § 846]

A.   INTRODUCTORY ALLEGATIONS

At all times relevant to this Information:

1.   Defendant FLEMING was a resident of Los Angeles County.

2.   Co-Conspirator 3 was a resident of Los Angeles County and employed as the live-in personal assistant to Victim M.P., who also resided in Los Angeles County.

3.   Co-Conspirator 4 was a resident of Los Angeles County and was known to defendant FLEMING as the "Ketamine Queen."

//

//

B.    OBJECT OF THE CONSPIRACY

       Beginning on a date unknown but no later than October 2023 and continuing until at least on or about October 30, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant ERIK FLEMING conspired with others known and unknown to the United States Attorney, to knowingly and intentionally distribute ketamine, a Schedule III controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(E)(i).

B.    MANNER AND MEANS OF THE CONSPIRACY

       The object of the conspiracy was to be accomplished, in substance, as follows:

       1.    Defendant FLEMING would communicate with other co-conspirators, including Co-Conspirators 3 and 4, about purchasing ketamine to distribute to Victim M.P.

       2.    Defendant FLEMING would negotiate with Co-Conspirator 3 the price defendant FLEMING would charge to deliver ketamine that defendant FLEMING acquired from his ketamine source, Co-Conspirator 4.

       3.    Defendant FLEMING would take payment from Co-Conspirator 3 and keep a portion for his cut, or "logistics fee," and deliver cash to Co-Conspirator 4 for ketamine.

       4.    Defendant FLEMING would deliver the ketamine from Co-Conspirator 4 to Co-Conspirator 3, knowing that Co-Conspirator 3 would use the ketamine to inject Victim M.P., and that Co-Conspirator 3 was not a medical doctor and did not have training or experience administering controlled substances.

//

2

C.    OVERT ACTS

     On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant FLEMING and others known and unknown to the Grand Jury committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

     Overt Act No. 1:    On October 10, 2023, Co-Conspirator 3 sent defendant FLEMING a text message about purchasing ketamine for Victim M.P., stating: "How much do you want per bottle and what is the nice tip you want[?]"

     Overt Act No. 2:    On October 10, 2023, in response to the text message described in Overt Act No. 1, defendant FLEMING confirmed he was willing to obtain and deliver ketamine and stated the following: "[g]etting price now. I need some upfront to pay when I pick up. And rest when I deliver."

     Overt Act No. 3:    On October 10, 2023, defendant FLEMING texted Co-Conspirator 3 an image of a vial of ketamine with a horse image on the packaging and stated: "10 ml vial – pure – $300 vial. Is 1000 fai[r] for me? – let me know how many vials."

     Overt Act No. 4:    On October 10, 2023, defendant FLEMING communicated with Co-Conspirator 4 using the Signal encrypted messaging application: "Hi Jas. It's Erik . . . Let me know your addy . . . . How many vials do u have availability."

     Overt Act No. 5:    On October 10, 2023, using the Signal messaging application, defendant FLEMING and Co-Conspirator 4 communicated about the type and price of the ketamine that Co-Conspirator 4 had available for sale.

Overt Act No. 6:   On October 11, 2023, using the Signal application, Co-Conspirator 4 told defendant FLEMING that her ketamine was high quality and offered a sample of the drug, stating: "It's unmarked but it's amazing – he take one and try it and I have more if he likes."

Overt Act No. 7:   On October 11, 2023, defendant FLEMING sent a screenshot of Co-Conspirator 4's message referenced in Overt Act No. 6 to Co-Conspirator 3 and stated: "[j]ust got this from my person. She only deal[s] with high end and celebs. If it were not great stuff she'd lose her business."

Overt Act No. 8:   On October 13, 2023, defendant FLEMING drove to Co-Conspirator 4's residence located in North Hollywood, California, and purchased a ketamine sample for Victim M.P., which was contained inside an unlabeled, unmarked clear glass vial with a blue cap.

Overt Act No. 9:   On October 13, 2023, defendant FLEMING delivered the sample ketamine vial to Co-Conspirator 3, knowing that Co-Conspirator 3 would be injecting Victim M.P. with the ketamine.

Overt Act No. 10:   On October 13, 2023, after administering one or more shots of ketamine to Victim M.P., Co-Conspirator 3 sent a text message to defendant FLEMING describing Victim M.P.'s response, stating: "seems good ... What number of bots does [Co-Conspirator 4] have?"

Overt Act No. 11:   On October 13, 2023, in response the text message described in Overt Act No. 10, defendant FLEMING stated: "As many as u want" and "Let me know how many ... and I'll confirm what she can get. But as of now she said she can fill any order."

1       <u>Overt Act No. 12:</u>   On October 13, 2023, Co-Conspirator 3 told

2  defendant FLEMING he would purchase "25 vials $5500 @220 +500 for you

3  for logistics."

4       <u>Overt Act No. 13:</u>   On October 14, 2023, defendant FLEMING drove

5  to Victim M.P.'s residence located in Los Angeles County and

6  collected $5,500 in cash from Co-Conspirator 3.

7       <u>Overt Act No. 14:</u>   On October 14, 2023, defendant FLEMING drove

8  to Co-Conspirator 4's residence in North Hollywood, California, and

9  purchased 25 vials of ketamine for Victim M.P.

10       <u>Overt Act No. 15:</u>   On October 14, 2023, defendant FLEMING drove

11  back to Victim M.P.'s residence located in Los Angeles County and

12  delivered the ketamine from Co-Conspirator 4 to Co-Conspirator 3.

13       <u>Overt Act No. 16:</u>   On October 23, 2023, Co-Conspirator 3 sent a

14  text message to defendant FLEMING requesting additional ketamine for

15  Victim M.P., stating: "Can we do same as last time again over next 2

16  days?"

17       <u>Overt Act No. 17:</u>   On October 23, 2023, in response to the text

18  message referenced in <u>Overt Act No. 16</u>, defendant FLEMING confirmed

19  he could get more, stating: "It will be same product. You want same

20  amount? Put the 5500 together asap and ill come get it as soon as

21  possible to get it all done tonight."

22       <u>Overt Act No. 18:</u>   On October 23, 2023, defendant FLEMING drove

23  to Victim M.P.'s residence and picked up approximately $6,000 in cash

24  from Co-Conspirator 3 to purchase ketamine from Co-Conspirator 4.

25       <u>Overt Act No. 19:</u>   On October 24, 2023, based on information

26  from Co-Conspirator 4, defendant FLEMING sent text message updates to

27  Co-Conspirator 3 about the delivery and timing of the ketamine,

28  including stating that Co-Conspirator 4's ketamine source -- which

Co-Conspirator 4 referred to as the "master chef" and "scientist" -- would make the supply available.

Overt Act No. 20:   On October 24, 2023, defendant FLEMING traveled to Co-Conspirator 4's residence in North Hollywood, California, and purchased 25 vials of ketamine in exchange for cash. As part of the transaction, Co-Conspirator 4 included ketamine lollipops as an "add on" for Victim M.P.'s large ketamine order.

Overt Act No. 21:   On October 24, 2023, defendant FLEMING traveled to Victim M.P.'s residence and delivered the ketamine referenced in Overt Act No. 20 to Co-Conspirator 3.

Overt Act No. 22:   On October 26, 2023, defendant FLEMING reached out to Co-Conspirator 3 to discuss how to better package the next purchase of ketamine, stating: "How are you? I realized on next shipment we could probably get it packaged in fewer bigger boxes instead or resale size."

Overt Act No. 23:   Between October 24, 2023 and October 28, 2023, Co-Conspirator 3 repeatedly administered shots of the ketamine provided by defendant FLEMING and Co-Conspirator 4 to Victim M.P., including shots that resulted in the death and serious bodily injury of Victim M.P. on October 28, 2023.

Overt Act No. 24:   On October 28, 2023, after Co-Conspirator 4 learned about Victim M.P.'s death from news reports, Co-Conspirator 4 called defendant FLEMING using the Signal application to discuss the co-conspirators distancing themselves from the aforementioned drug deals by, among other things, deleting digital evidence on their cell phones.

<u>Overt Act No. 25:</u>  On October 28, 2023, Co-Conspirator 4 updated the setting on the Signal application to automatically delete messages between Co-Conspirator 4 and defendant FLEMING.

<u>Overt Act No. 26:</u>  On October 30, 2023, after speaking with Co-Conspirator 3, defendant FLEMING sent the following text message to Co-Conspirator 4 using the Signal application: "Please call . . . Got more info and want to bounce ideas off you.  I'm 90% sure everyone is protected. I never dealt with [Victim M.P.]. Only his Assistant. So the Assistant was the enabler. Also they are doing a 3 month tox screening ... Does K stay in your system or is it immediately flushed out[?]"

1                                COUNT TWO

2                    [21 U.S.C. §§ 841(a)(1), (b)(1)(E)(i)]

3       On or about October 24, 2023, in Los Angeles County, within the

4  Central District of California, defendant ERIK FLEMING knowingly and

5  intentionally distributed ketamine, a Schedule III controlled

6  substance, the use of which resulted in the death and serious bodily

7  injury of M.P. on or about October 28, 2023.

8

9                               E. MARTIN ESTRADA
                                United States Attorney
10

11

12                              MACK E. JENKINS
                                Assistant United States Attorney
13                              Chief, Criminal Division

14                              IAN V. YANNIELLO
                                Assistant United States Attorney
15                              Chief, General Crimes Section

16                              HAOXIAOHAN CAI
                                Assistant United States Attorney
17                              Major Frauds Section

18

19

20

21

22

23

24

25

26

27

28

                                      8

**CERTIFICATE OF SERVICE**

I, **Abigail M. Haun**, declare:

That I am a citizen of the United States and a resident of or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of 18; and that I am not a party to the above-titled action;

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

**PLEA AGREEMENT FOR ERIK FLEMING.**

| | |
|---|---|
| ☐ Placed in a closed envelope for collection and inter-office delivery, addressed as follows: | ☐ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows: |
| ☐ By hand delivery, addressed as follows: | ☐ By facsimile, as follows: |
| ☒ Via email, as follows: | ☐ By Federal Express, as follows: |

**ERIK FLEMING**
**c/o Burton C. Jacobson**
**bcjlaw@aol.com**

This Certificate is executed on **July 12, 2024**, at Los Angeles, California. I certify under penalty of perjury that the foregoing is true and correct.

_Abigail M. Haun_
Abigail M. Haun
Legal Assistant